UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN GORNEY

                Plaintiff,

v.

CHARTER TWP. OF BROWNSTOWN,
ET AL.,

                Defendants.

_____/

Case No. 14-12731

Paul D. Borman
United States District Judge

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 22)

     This case is a civil rights action arising from Plaintiff's tasering and arrest in July 2012. The Complaint raises three claims: (1) 42 U.S.C. § 1983 against Brownstown Township police officers; (2) 42 U.S.C. § 1983 against Brownstown Township, and (3) state law claims of assault and battery against the police officers. Plaintiff alleges that the defendant officers were called to his home after his dog Coco attacked a neighbor's dog in the street. Plaintiff claims that he did not break any law, did not pose a threat to the investigating officers, but nevertheless was unjustifiably tased twice in the back – the second time after he was handcuffed. (ECF No. 1, Compl. ¶¶ 9-12.)

     Now before the Court is Defendants Brownstown Township, Corey Wilson, and Bryan Wheeler's Motion for Summary Judgment. (ECF No. 22.) The Complaint in this action was filed on July 11, 2014. (ECF No. 1.) Defendants filed the present Motion for Summary Judgment on September 11, 2015. Plaintiff's previous counsel, however, moved to withdraw from this action one week after Defendants filed their dispositive motion. (ECF No. 23.The

Court allowed Plaintiff's counsel to withdraw. (ECF No. 26.) Thereafter, Plaintiff retained

other counsel and was allowed to file a late response to the Motion for Summary Judgment.

(ECF No. 32.) Defendants then filed a reply. (ECF No. 33.)

A hearing on Defendants' motion for summary judgment was held on August 12, 2016.

For the reasons stated below, the Court will grant in part and deny in part Defendants' motion for

summary judgment.

## I.  BACKGROUND

Unsurprisingly, the parties in this action have set forth two markedly different versions of

the circumstances surrounding Plaintiff's arrest on July 18, 2012.  While fully aware that a court

evaluating a motion for summary judgment must view all the facts and draw all inferences in

favor of Plaintiff, the Court sets forth both Defendants' and Plaintiff's versions of the facts

below to highlight the inherent issues of fact that permeate this record.

A.       Plaintiff's Version of the Events

On July 18, 2012, around 9:00 p.m., Plaintiff's 15-20 pound American Bulldog, Coco,

broke loose from her restraining collar and escaped from Plaintiff's garage, and ran up to a

neighbor's dog in an attempt to play. (Defs.' Ex. F, Pl.'s Dep., at 48-50.)[1]  Coco had never

attacked another dog and had never escaped from her collar previously. (*Id*.) Plaintiff retrieved

Coco but, as he was doing so, her teeth "slid" across the leg of the other dog. (*Id*.) A neighbor

witnessed the incident and called the police. (Defs.' Ex. A, Police Report.)

---

[1] For ease of reference, all citations to the record will refer to the exhibits attached to
Defendants' motion for summary judgment unless otherwise noted.

Defendant Officers Wheeler and Wilson responded to the neighbor's report of a dog attack. (*Id*.) Defendants arrived and spoke with the neighbor who made the report, and they were advised that Plaintiff owned the dog that perpetrated that attack. (*Id*.) Defendants then approached Plaintiff who, at that time, was spraying grass off his driveway with a hose. (Pl.'s Dep., at 48.)

Defendant Wilson spoke with Plaintiff who informed him that Coco had gotten loose, but explained he had caught Coco and put her in the garage. (*Id*., at 58.) Defendant Wilson then went down the street to speak with the individual who was walking the dog that had been attacked, Courtney Edwards, and his grandmother, Mazie Gremain, who owned that dog. (*Id*., at 59; Police Rept., at 2.) Edwards advised Defendant Wilson that Plaintiff's unrestrained dog ran toward the dog he was walking and ultimately bit that dog on its leg. (Police Rept., at 2.) Defendant Wilson did not find any physical injuries to the dog that was attacked. (*Id*., Ex. B, Wilson Dep., at 46.) While Defendant Wilson spoke with Edwards and Germain, Defendant Wheeler remained in front of Plaintiff's home but did not speak with him. (Pl.'s Dep., at 59; *see also* Ex. C, Wheeler Dep., at 39.)

Defendant Wilson then returned to Plaintiff's residence and attempted to contact animal control to come out and take possession of the dog, however, animal control did not respond. (Pl.'s Dep., at 60-61.) Defendant Wilson then instructed Plaintiff to put his dog in his car and take the dog to animal control. (*Id*.; Wilson Dep., at 48; Ex. C, Wheeler Dep., at 39.) Plaintiff testified that he was confused at this point and did not respond to Defendant Wilson. Defendant Wilson then yelled in Plaintiff's face, "What don't you understand?" (Pl.'s Dep., at 60-61.) Defendant Wilson advised Plaintiff that he was hindering the investigation and breaking the law.

(*Id*.)

At this time, Defendant Wilson was standing in front of Plaintiff while Defendant Wheeler was behind Plaintiff.  (*Id*. at 62-63.)  Plaintiff then put down his garden hose and walked toward the garage to get his dog as instructed.  (*Id*. at 62.)  Plaintiff stopped to ask Defendant Wilson, "What are you going to do?  Are you going to harm the dog if I let her loose?"  (Pl.'s Dep., at 67.)   Plaintiff believed the Defendant officers "wanted [him] to let it loose again to be loaded up to take it to the shelter."  (*Id*., at 73.)  Rather than respond verbally, Defendant Wilson pushed Plaintiff away from the garage.  Plaintiff testified: "So I just turned around and he pushed me back away from the garage, and then I got nervous. In my head, what I was thinking – I started to go to my house; to the house, to the front door, because I was scared. I wanted to get away." (Pl.'s Dep., at 68.)  Plaintiff then moved towards his house, but Defendant Wilson pushed Plaintiff away from his house.  Then Plaintiff again tried to walk to his garage but Defendant Wilson shoved him "back real hard away from the garage."  (*Id*. at 69.)  Plaintiff lost his balance and began to fall.  (*Id*., at 69.)  Plaintiff attempted to regain his balance by pitching himself forward toward Defendant Wilson and raising his hand up level with his face.[2]  (*Id*. at 69, 105.)

Plaintiff was then tased without warning by Defendant Wheeler and fell on to his concrete driveway.  (*Id*., at 69, 76-77.)  Plaintiff lay on the ground unable to move and was handcuffed by Defendant Wilson.  (*Id*., at 78-79.)  After he was handcuffed, and while he lay on

---

[2] While there is some confusion over whether Plaintiff actually grabbed Defendant Wilson, Plaintiff clarified in his deposition that he never grabbed Defendant Wilson by the shirt. (Pl.'s Dep., at 105.)  Consistent with Plaintiff's testimony, neither Defendant Wilson nor Wheeler testified that Plaintiff grabbed Defendant Wilson's shirt.

the ground, Plaintiff saw his wife pull up.  (Pl.'s Dep., at 79.)  Plaintiff testified that he remembered someone telling him to roll over so the probes from the taser could be removed from his back.  (*Id*., at 81.)  Before he could comply, Defendant Wilson put both knees into his back and Plaintiff was tased a second time by Defendant Wheeler.  (*Id*., at 79-81.)  Plaintiff thinks he may have also been tased a third time.  (*Id*.)  Plaintiff also lost consciousness at some point.  (*Id*.)

Later, Defendants Wheeler and Wilson loaded Plaintiff into the police car while laughing about the incident, and Defendant Wheeler stated to Plaintiff, "See, it works don't it?"  (*Id*., at 85.)  Defendant Wilson then put his hand on Plaintiff's shoulder and asked "If you see me tomorrow out there or anywhere, you won't try to hurt me or anything will you?"  (*Id*.)  Plaintiff did not respond and just got in the police car.  (*Id*.)

Plaintiff's wife, Rowena Gorney, testified that she came home to find her husband laying handcuffed in the driveway and police officers in her yard.  (Ex. G, R. Gorney Dep., at 12-13.)  Mrs. Gorney witnessed Defendant Wilson walk towards Plaintiff and instruct him to roll over on to his stomach.  (*Id*., at 17.)  As Plaintiff began to roll over, Mrs. Gorney saw Defendant Wilson jump on his back with both his knees and, at the same time, Officer Wheeler tased Plaintiff a second and perhaps a third time.  (*Id*., at 17, 48.)  Mrs. Gorney did not see Plaintiff kick, fight, or struggle with the Defendants while he was handcuffed.  (*Id*., at 48.)  Defendant Wheeler also did not give any warning before he tased Plaintiff while he lay handcuffed on the ground.  (*Id*., at 49.)  Plaintiff was rendered unconscious.  (*Id*. at 50.)  Mrs. Gorney also testified that Plaintiff had relayed to her that he advised the Defendant officers when they first arrived at his house that he was on medication and was bipolar.  (R. Gorney Dep., at 37-38.)

5

B.      Individual Defendants' Versions of the Events

Defendant Wilson testified that when he first spoke with Plaintiff regarding the incident on July 18, 2012, Plaintiff indicated that his dog had escaped earlier and attacked another dog and Plaintiff had put the dog back in his garage.  Plaintiff also told Defendant Wilson that his dog had gotten loose previously – as recently as the day before.  (Ex. B, Wilson Dep., at 44.) Defendant Wilson then left Plaintiff in his driveway with Defendant Wheeler and went to take the statement of the owner of the dog that was attacked.  (*Id.*, at 46.)

Upon his return to Plaintiff's driveway, Defendant Wilson instructed Plaintiff, who remained in his driveway holding his hose with a three foot long wand attachment, that he would need to load up his dog and follow them to the animal shelter.  (*Id.* at 48.)  Plaintiff responded by asking, "What if I don't?"  (*Id.*)  Defendant Wilson advised him that if he failed to do so he would be cited for hindering and obstructing a police investigation.  (*Id.* at 49; Wheeler Dep., at 42.)  In response, Plaintiff stared blankly at him.  (Wilson Dep., at 52; Wheeler Dep., at 42.) Defendant Wheeler described Plaintiff in that moment as having a "look about him like we were getting ready to fight."  (Wheeler Dep., at 43.)  Plaintiff then told the Defendants that he was going to let his dog out to attack them and they could shoot at the dog because they needed the practice.  (Wilson Dep., at 53; Wheeler Dep., at 44.)

Plaintiff then began to walk towards the garage, but Defendant Wilson instructed him to stop several times because he believed Plaintiff had threatened the officers with a dog attack. (Wilson Dep., at 57-58; Wheeler Dep., at 45.)  Eventually, Plaintiff stopped walking and Defendant Wilson stepped in front of him while Defendant Wheeler stood behind him.  (Wheeler Dep., at 47.)  Defendant Wilson advised Plaintiff he was under arrest for hindering and

6

obstruction and placed his hands on Plaintiff. (Wilson Dep., at 59-60.) Defendant Wilson grabbed Plaintiff's left wrist while Defendant Wheeler grabbed Plaintiff's right wrist, but Plaintiff pulled away from the Defendants's grip. (Wheeler Dep., at 47.) Defendant Wilson then stepped back from Plaintiff and Plaintiff "raised his arms up in a combative nature and came towards" Defendant Wilson. (Wilson Dep., at 60; Wheeler Dep., at 47-48.) Defendant Wheeler, still standing behind Plaintiff, yelled "taser!" and simultaneously deployed the taser in dart mode into Plaintiff's back. (Wilson Dep., at 67; Wheeler Dep., at 51-52.) Both taser darts landed on Plaintiff's middle-to-low back. (Wilson Dep., at 69.)

After he was tased, Plaintiff fell face first on to the ground and Defendant Wilson handcuffed him. (Wilson Dep., at 74.) At that point, Defendants Wilson and Wheelers' supervisor, Sergeant Goolsby, arrived on the scene and shortly thereafter, Mrs. Gorney pulled up as well. (*Id.*) After speaking briefly with both Goolsby and Mrs. Gorney, Defendant Wilson walked back to Plaintiff to remove the taser darts from Plaintiff's back. (Wilson Dep., at 78.) Defendant Wilson instructed Plaintiff to roll on to his stomach, but Plaintiff, who lay on his side with his hands cuffed behind his back, refused. (*Id.*; Wheeler Dep., at 55.) Defendant Wilson then knelt down and tried to remove the darts, but Plaintiff "began to roll on his back from side to side and began kicking his legs." (Wilson Dep., at 80; Wheeler Dep., at 58-59.) Defendant Wilson and Wheeler worried that Plaintiff would drive the darts further in to his own back or prick Defendant Wilson with the probes. (Wilson Dep., at 86; Wheeler Dep., at 72.) Defendant Wilson moved away from Plaintiff's kicking legs and Defendant Wheeler, without any verbal warning, pulled the trigger on his taser a second time and possibly a third time, shocking Plaintiff through the darts that remained in his back from Defendant Wheeler's first use of the

7

taser.[3]  (Wilson Dep., at 82; Wheeler Dep., at 60.)

After being tased again, Plaintiff rolled on to his stomach and Defendant Wilson removed the probes from his back.  Plaintiff eventually informed the Defendants during his booking at the police station that he was bipolar.  (Wheeler Dep., at 70.)

C.      Subsequent Proceedings

On November 21, 2012, Plaintiff appeared before Judge James K. Kersten in the 33rd District Court in Woodhaven for his pretrial hearing.  (Ex. H, 11/21/12 Trans.)  Plaintiff pleaded no contest to a "Disorderly Person" charge, and in exchange, the prosecutor dropped the charges of hindering and obstructing, and assault and battery.  (*Id.*, at 3-4.)  The state court requested, and Plaintiff had no objection, to the use of the Police Report as the factual predicate for his no contest plea.  (*Id.*, at 5-6.)

On December 10, 2012, Plaintiff was sentenced to six months of probation pursuant to MICH. COMP. LAWS § 771.1.  (Ex. H, 12/10/12 Trans., at 3-4.)  Pursuant to § 771.1 a court may sentence a defendant to probation or delay the imposition of a sentence for up to a year.  *See* MICH. COMP. LAWS § 771.1(a), (b).  Plaintiff was also ordered to take an anger management class, pay a fine, perform two days of community service, and continue with mental health counseling.  (12/10/12 Trans., at 4.)

## II. STANDARD OF REVIEW

Defendants have moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that the "court shall grant summary judgment if the movant

---

[3] Defendant Wheeler and Wilson both claimed that the second use of the taser was not for the full five second deployment, but admit that the computer report provides that the taser was used twice, nine minutes apart, and both taser cycles lasted five seconds.  (Ex. E, Taser Report.)

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact." *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).  However, in making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e).  The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

9

III. ANALYSIS

Plaintiff sets forth three claims in his Complaint: (1) excessive force and/or failure to intervene in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 against the Defendant officers; (2) a claim against Defendant City of Brownstown pursuant to § 1983 for policies and practices that resulted in the deprivation of Plaintiff's constitutional rights; and (3) state law claims of assault and battery against the Defendant officers.

A.      Collateral Estoppel

Defendants first argue that Plaintiff is collaterally estopped from pursuing an excessive force claim against Defendants because he accepted a nolo contendere plea, otherwise known as pleading "no contest," to the charge of "disorderly person."  (Defs.' Br., at 16.)  Defendants fail to identify the specific statute or ordinance under which Plaintiff was convicted and no citation to the statute or ordinance was set forth in the record.[4]

Federal courts apply state collateral estoppel law when determining whether a § 1983 claim is barred by collateral estoppel.  *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001).  Collateral estoppel under Michigan law requires: (1) the parties in both proceedings are the same or in privity, (2) there was a valid, final judgment in the first proceeding, (3) the same issue was actually litigated in the first proceeding, (4) that issue was necessary to the judgment, and (5) the party against whom preclusion is asserted (or its privity) had a full and fair opportunity to litigate the issue."  *United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir. 2004)

---

[4]  The Court notes that "Disorderly Person" has a number of definitions under the Michigan Penal Code, the most pertinent to this action appears to be: "[a] person who is intoxicated in a public place and who is either endangering directly the safety of another person or of property or is acting in a manner that causes a public disturbance."  MICH. COMP. LAWS § 750.167(e).

10

(citation omitted).

Defendants contend that under Michigan law a nolo contendere plea has the same effect as a guilty plea, and it is an admission of all the essential elements of the charged offense. (Defs.' Br., at 16, citing *People v. New*, 427 Mich. 482, 493 n. 10 (1986)).  Defendants note that the State Court used the Police Report as the factual basis for accepting Plaintiff's no contest plea.  Defendants then conclude, based upon an unpublished Federal District Court decision analyzing *Heck v. Humphrey*, 512 U.S. 477 (1994), that Plaintiff had the ability to "litigate the legality of his arrest, including the alleged excessive force used by Wilson and Wheeler.  He chose not to do so....Gorney is collaterally estopped from now claiming that the force used to effectuate the arrest was excessive or otherwise unconstitutional."  (Defs.' Br., at 17, citing *Wylie v. Overby*, No. 05-CV-71945, 2006 WL 1007643, *6 (E.D. Mich., Apr. 14, 2006) (Cleland, J.)).

Defendants' argument is flawed.  As an initial matter, Defendants' reliance upon case law analyzing the *Heck* doctrine is misplaced because the *Heck* doctrine and collateral estoppel are not synonymous.[5]  Further, Defendants appear to argue that Plaintiff cannot contest or re-litigate

---

[5] In *Heck*, the Supreme Court concluded that if a state prisoner's success in a § 1983 action for money damages would "necessarily imply the invalidity of his conviction or sentence" then that action "must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  512 U.S. at 487.  In the Sixth Circuit, where a plaintiff asserts a claim that contradicts an element of an underlying criminal offense, then the *Heck* doctrine bars the subsequent § 1983 suit.  *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 609 (6th Cir. 2014).

It is unclear whether Defendants are attempting to raise the *Heck* doctrine.  Regardless, the elements of Plaintiff's "disorderly person" offense are not specified and cannot be identified on this record.  Thus, the Court would be unable to determine whether *Heck* bars Plaintiff's civil claims because it is unclear whether an element of his underlying offense would be contradicted by these civil claims.  Additionally, the Court notes there could be a threshold issue regarding the application of the *Heck* doctrine where Plaintiff's short sentence (six months of probation)

11

the facts as set forth in the Police Report and therefore Plaintiff cannot factually support his §

1983 claim for excessive force.  The Michigan Supreme Court has explicitly held, however, that

a

> nolo contendere plea cannot be considered "actual litigation," at least not in terms
> of collateral estoppel jurisprudence.  The essence of a nolo contendere plea is in
> its name, "nolo contendere," or "I will not contest it."  If the charges are
> uncontested, they are necessarily unlitigated.  Neither can we say that the procedures
> followed by the judge in establishing a factual basis for taking a nolo
> contendere plea constitute "actual litigation."

*Lichon v. American Univ. Ins. Co.*, 435 Mich. 408, 429-30 (1990).  A Federal court in this

district came to the same conclusion in an analogous case, *Shirley v. City of Eastpointe*, No. 11-

14297, 2013 WL 4666890, at *8 (E.D. Mich., Aug. 30, 2013).  In *Shirley*, the plaintiff had

pleaded no contest to resisting and obstructing a police officer in state court and the police report

was admitted as the factual basis for the plea.  *Id*.  The *Shirley* court rejected the argument that

the use of the police report barred the plaintiff's subsequent § 1983 excessive force claim and

recognized that under Michigan law a no contest plea did not represent "actual litigation" for

collateral estoppel purposes.  *Id*. (citing *Lichon*, 435 Mich. at 429-30 and collecting cases); *see

also Karttunen v. Clark*, No. 06-13388, No. 2007 WL 2902872, *2 (E.D. Mich. Oct. 2, 2007)

(recognizing that MICH. R. EVID. 410 was amended after *Lichon* to permit the admission of a

nolo contendere plea as evidence under certain circumstances, but finding that amendment did

not impact "the *Lichon's* court's ruling that a nolo contendere plea cannot be considered 'actual

---

may have precluded him "as a matter of law" from seeking habeas relief.  *See Powers v.
Hamilton Cnty. Pub. Defenders Comm'n*, 501 F.3d 592, 601-03 (6th Cir. 2007) (holding that "a §
1983 plaintiff is entitled to a *Heck* exception if the plaintiff was precluded 'as a matter of law'
from seeking habeas redress, but not entitled to such an exception if the plaintiff could have
sought and obtained habeas review while still in custody but failed to do so.); *see also Heck*, 512
U.S. at 500 (concurrence, Souter, J.).

litigation' for the purposes of collateral estoppel.").

In the present case, Defendants have failed to identify: (1) the specific statute or ordinance to which Plaintiff pleaded no contest, (2) the essential elements of the charge of "Disorderly Person," or (3) the portions of the Police Report that would support those elements. Thus, based on the present record it unclear what facts necessarily supported Plaintiff's no contest plea. Further, the Court finds that pursuant to *Lichon*, and as recognized in *Shirley*, Plaintiff's nolo contendere plea does not constitute "actual litigation" under Michigan law for the purpose of collateral estoppel. Accordingly, the Court concludes that collateral estoppel does not bar the present action.

> B.   Plaintiff's Claims of Excessive Force pursuant to 42 U.S.C. § 1983 against the Individual Defendants

In order to make a claim pursuant to § 1983, a plaintiff must establish an existing constitutional right violated by a person acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). "There is a long-standing principle that government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Here, the individual Defendants claim they are entitled to qualified immunity. Once the defense of qualified immunity is raised, the plaintiff bears the burden to demonstrate that the defense is unwarranted. *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2007).

The purpose of qualified immunity is to "shield the official from suit altogether, saving

13

him or her from the burdens of discovery and costs of trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). A government official is entitled to qualified immunity "unless a plaintiff pleads facts showing: "(1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, --- U.S. --- , 131 S. Ct. 2074, 2080 (2011) (citation omitted). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014). This order of inquiry is no longer mandatory; courts are allowed to use their discretion in deciding which of the two steps of the qualified immunity analysis should be addressed first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "[I]f genuine issues of material fact exist as to whether the officer[s] committed acts that would violate a clearly established right, then summary judgment is improper." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011); *see also King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012), *cert. denied*, --- U.S. ----, 133 S.Ct. 1473 (2013). A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In the present case, Plaintiff alleges that Defendant Wheeler used excessive force during his arrest of Plaintiff by twice deploying his taser, and Defendant Wilson failed to intervene, restrain or protect Plaintiff from Defendant Wheeler's use of excessive force. (Compl., at ¶¶ 17-18.) "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989).

14

To make a showing of excessive force "[u]nder the Fourth Amendment, [courts] apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess*, 735 F.3d at 472 (6th Cir. 2013) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)); *see also Graham*, 490 U.S. at 396-97. The Court is guided by three factors when conducting this inquiry: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)); *see Graham*, 490 U.S. at 396. The inquiry must also be "assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Burgess*, at 473 (citing *Graham*, 490 U.S. at 396-97); *accord Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). The court must also carefully balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466-67 (6th Cir. 2006). "Ultimately, the court must determine 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Goodwin v. Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (citation omitted)).

When more than one officer is alleged to have violated a plaintiff's Fourth Amendment rights, each officer's conduct must be analyzed separately. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own actions.") (citation omitted). "To hold an officer liable for the use of excessive force, a plaintiff

must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'"  *Id.* (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  An officer's mere presence during an altercation, however,  "without a showing of some responsibility, cannot suffice to subject them to liability."  *Burgess*, 735 F.3d at 475.  If an officer is not alleged to have participated in the challenged conduct, "there must be a showing that they either supervised the deputies who did so or owed [the plaintiff] a duty of protection." *Id.* (citation omitted).  To establish a duty of care, Plaintiff must establish that "these defendants 'observed or had reason to know that excessive force would be or was being used' *and* 'had both the opportunity and the means to prevent the harm from occurring.'"  *Id.* (emphasis in original).

Despite Plaintiff's acknowledgment in his briefing that each Defendant's conduct must be examined separately, Plaintiff (and Defendants) have failed to do so.  Regardless, each individual Defendant's conduct is addressed seperately *infra*.

1.      Defendant Wheeler, Excessive Force

"A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions."  *Morrison v. Board of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002).  Plaintiff alleges that Defendant Wheeler's use of the taser on him twice constituted excessive force in violation of the Fourth Amendment, accordingly the Court finds that the relevant and logical segments giving rise to Plaintiff's claims of excessive force are the first and second deployment of the taser.

16

a.    The First Tasing

Viewing the facts in a light most favorable to Plaintiff, as this Court must, Plaintiff claims he was initially confused when Defendant Wilson told him to load up his dog and take her to the animal shelter.  Defendant Wilson then yelled at Plaintiff which further confused and scared him.  Plaintiff then walked towards his garage per Defendant Wilson's instructions but stopped to ask whether the Defendant officers were going to harm his dog when he got her from the garage.  Defendant Wilson then shoved Plaintiff away from the garage a "couple of times" and then when he began walking towards his house shoved him back "once or twice."  (Pl.'s Dep., at 76.)  Defendant Wilson then pushed Plaintiff hard one last time as he attempted to walk back to the garage which caused him to lose his balance.  (*Id.*)  Plaintiff attempted to regain his balance and fell towards Defendant Wilson and as he did so, he raised his hand level to his face. (*Id.* at 75.)  Plaintiff was then tased without warning by Defendant Wheeler.  Plaintiff testified that he did not attempt to hit or resist the officers prior to being tased and denied ever telling the Defendant officers he would release his dog to attack them.

Plaintiff asserts that he was not accused of a serious or violent crime, and was never advised to stop walking or that he was under arrest by the Defendant officers.  (Pl.'s Dep., at 73-74.)  Further, Defendant Wilson admitted that Plaintiff never attempted to flee.  (*See* Wilson Dep., at 66, admitting Plaintiff made no threats, was not verbally abusive, and did not attempt to flee.)  Additionally, it is undisputed that Plaintiff was no longer in possession of the garden hose or wand attachment when he was pushed (there is no testimony that it was in his hands at that time by either Defendant officer), and it is also undisputed that Plaintiff was attempting to obey Defendant Wilson's original instructions to walk to his garage when he was tased by Defendant

17

Wheeler.  (*See* Def. Wilson Dep., at 57-58.)  Thus, viewing the facts under a light most favorable

to Plaintiff, the factors under *Graham* indicate the situation called for minimal force.  *See*

*Martin*, 712 F.3d at 958.

Defendants' argument that the force used was objectively reasonable rests upon crediting

their version of the facts over Plaintiff's version – that Plaintiff took a threatening stance against

Defendant Wilson and lunged at him, that Plaintiff threatened to release his dog to attack them,

and that Plaintiff refused to stop walking when he was instructed to do so.  Yet, where Plaintiff

and Defendants have provided two different narratives that cannot be reconciled, it is well settled

that the Court must credit Plaintiff's version of the facts unless his version is "blatantly

contradicted by the record" such that no reasonable jury could believe it.  *Scott v. Harris*, 550

U.S. 372, 380 (2007).

Here, it is undisputed that Plaintiff moved towards Defendant Wilson with this hands

raised level with his own face.  Yet, Plaintiff testified that his movement towards Defendant

Wilson was involuntary and was caused by being shoved by Defendant Wilson in clear view of

Defendant Wheeler.  The Court finds that whether Plaintiff's involuntary movement towards

Defendant Wilson could be reasonably interpreted as a threat by Defendant Wheeler is a

question of material fact that cannot be resolved by the Court upon a motion for summary

judgment.

The case law is clearly established that where a suspect is not an immediate threat,

actively resisting, attempting to flee, or refusing to be handcuffed, then the use of a taser against

that suspect is a violation of the suspects clearly established Fourth Amendment rights.  *See*

*Hagans v. Franklin Cnt'y Sheriff's Office*, 695 F.3d 505, 509-10 (6th Cir. 2012) (collecting cases

18

illustrating spectrum of compliance); *see also Correa v. Simone*, 528 F. App'x 531, 534 (6th Cir. 2013) (holding that the use of a taser against the plaintiff was excessive because "Correa did not pose an immediate threat to the safety of the officer or others because, while he allegedly had a gun, at the time Simone used the taser, Correa's hands were in the air and he was not resisting."); *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. 2010) (holding that "[a]bsent some compelling justification – such as the potential escape of a dangerous criminal or the threat of immediate harm – the use of such a weapon on a non-resistant person is unreasonable." (emphasis added)).  In the present case, the Court must assume that Plaintiff's movement towards Defendant Wilson was involuntary and that Defendant Wheeler would have seen Plaintiff being shoved.  *See Brown v. Weber*, 555 F. App'x 550, 553-54 (6th Cir. 2014) (affirming the denial of qualified immunity based upon finding that the plaintiff's version of the facts – that he did not assume a "fighting stance" and his later body movements may have been "an involuntary reaction to being tased" – was not blatantly contradicted by the record.)

Given these facts, the Court concludes that a reasonable officer would not have considered Plaintiff an immediate threat and any reasonable officer would have known that tasing Plaintiff without any justification would have violated clearly established law. Accordingly, summary judgment is denied and qualified immunity does not preclude Plaintiff from pursuing his excessive force claim against Defendant Wheeler for the first taser deployment.

19

   b.  The Second (and Possible Third) Tasing

 It is undisputed that at the time he was tased a second time (and possibly a third time[6])

by Defendant Wheeler, Plaintiff lay on the ground with his hands cuffed behind his back.

Defendants claim that Plaintiff cannot dispute their testimony that he was kicking and actively

resisting Defendant Wilson's attempt to remove the taser's barbs from his back because he was

unconscious.  (*See* Pl.'s Dep., at 81.)  Plaintiff's wife, however, witnessed the situation and

testified that Plaintiff did not kick, roll, or otherwise resist Defendant Wilson while he was

handcuffed on the ground.  Defendants argued during the hearing that Plaintiff's wife looked

away and could not testify regarding Plaintiff's behavior immediately prior to him being tased a

second or third time.  Plaintiff's wife's testimony was clear however that she did not witness him

resist while handcuffed, and she only looked away *after* he was tased by Defendant Wheeler.  (R.

Gorney Dep., at 17-18, 22.)  Crediting this testimony, the Court must conclude that Plaintiff was

restrained and compliant when Defendant Wheeler tased him a second (and possibly a third)

time.

   Since Plaintiff was neither resisting, attempting to flee, nor an immediate threat to the

Defendant officers after he was handcuffed and lying on the ground, all of the *Graham* factors

dictate little or no force should have been utilized against Plaintiff.  Indeed, the Sixth Circuit

recognized in 2006 "that the use of force after a suspect has been incapacitated or neutralized is

excessive as a matter of law."  *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir.

2006) (collecting authority); *see also Phelps v. Coy*, 286 F.3d 295, 301-02 (6th Cir. 2002)

---

   [6] Computer evidence indicates that the taser was only deployed twice.  (Ex. E.)  Plaintiff
and his wife indicate that he was tased three times.  However, whether Plaintiff was tased twice
or three times is not of import to the Court's ruling on this motion.

(recognizing that "there was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was."); *Morrison v. Bd. of Trustees of Green Twp*., 583 F.3d 394, 406 (6th Cir. 2009) (finding that it was clearly established as of 2002 that pushing the face of a suspect into the ground in the absence of a threat to officer safety constituted excessive force).  Given this case law, it was clearly established in July, 2012 that tasing a compliant and handcuffed suspect was "objectively unreasonable" and violated a suspect's Fourth Amendment right to be free from excessive force, and any reasonable officer would be aware of the same.  *See Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015) (noting the "simple dichotomy" that "[w]hen a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him, but when a suspect does not resist, or has stopped resisting, they cannot.")

Accordingly, the Court concludes that Defendant Wheeler's request for qualified immunity and summary judgment regarding Plaintiff's claim for excessive force as it relates to the second taser deployment must be denied.

2.    Defendant Wilson, Failure to Intervene

Plaintiff alleges that Defendant Wilson's failure to intervene or protect Plaintiff from Defendant Wheeler's use of force, *i.e.* two or three deployments of his taser, constituted excessive force in violation of the Fourth Amendment.  As set forth *supra*, to establish that Defendant Wilson owed Plaintiff a duty of care, Plaintiff must establish that Defendant Wilson "'observed or had reason to know that excessive force would be or was being used' *and* 'had both the opportunity and the means to prevent the harm from occurring.'" *Burgess*, 735 F.3d at 475.

21

Neither Plaintiff nor Defendants analyze Plaintiff's failure to intervene claim separately from Plaintiff's excessive force claim against Defendant Wheeler based on his use of the taser. Both parties, rather, conflate the analysis and the conduct of the officers in their briefing. The Court, however, finds that based on the *undisputed* record, Plaintiff cannot establish that Defendant Wilson had the opportunity or the means to prevent Defendant Wheeler from twice tasing Plaintiff.

Prior to the first tasing, Defendant Wilson was standing in front of Plaintiff while Defendant Wheeler stood behind Plaintiff, and prior to the second tasing, Defendant Wheeler was kneeling on top of Plaintiff. Plaintiff also testified that Defendant Wheeler did not offer any warning that he was going to tase Plaintiff on either occasion he was tased. Defendant Wheeler testified regarding his first taser deployment that he deployed his taser and yelled "taser!" simultaneously. (Wheeler Dep., at 51-52.) Defendant Wheeler also testified that he did not issue any warning regarding his second (or third) use of the taser which was administered while Plaintiff lay handcuffed on the ground. (*Id.*, at 60.) Given these undisputed facts and the lack of any argument to the contrary, the Court finds that Defendant Wilson could not have known that Defendant Wheeler was going to deploy his taser in either instance and he would not have had the opportunity to prevent the same.

In sum, taking the facts in a light most favorable to Plaintiff, Plaintiff has failed to establish any genuine issue of material fact regarding whether Defendant Wilson owed him a duty of care. Accordingly, Plaintiff cannot establish Defendant Wilson's acts or failure to act constitute a violation of his Fourth Amendment right to be free from excessive force and

summary judgment is required.[7]

C.    Claims against Defendant Township

For a municipality to be liable for a constitutional violation under § 1983, the violation

must be a result of a policy or custom of the city. *Monell v. Dept. of Social Services*, 436 U.S.

658, 694 (1978). "That is to say, the liability of counties and other local governments under §

1983 depends solely on whether the plaintiff's constitutional rights have been violated as a result

of a 'policy' or 'custom' attributable to the county or local government." *Holloway v. Brush*,

220 F.3d 767, 772 (6th Cir. 2000). There are four general paths a plaintiff may take to "prove

the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the

municipality's legislative enactments or official agency polices; (2) actions taken by officials

with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a

custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of

Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted). In the present action,

Plaintiff asserts that Defendant Brownstown's policies were inadequate.

1.    Failure to Train

Plaintiff "alleges a policy of inadequate training or supervision as it relates to the use of

Taser."[8]  (Pl.'s Resp., at 22.)  In certain, limited circumstances, "a local government's decision

---

[7] The Court notes that Plaintiff limited his excessive force claims against Defendant
Wilson to only the use of the taser. (Pl.'s Resp., at 19-20; "the defendant officers are not entitled
to summary judgment based on qualified immunity on Plaintiff's claims premised upon Taser
use.")

[8] Given Plaintiff's explicit limitation regarding his policy claim in his brief, the Court
does not address Plaintiff's unsupported statement that Defendant Brownstown Township failed
to train officers regarding "emotionally compromised individuals and dog complaints." (Pl.'s
Resp., at 24.)  The Court notes, however, that such a claim would fail based upon this record

not to train certain employees about their legal duty to avoid violating citizens' rights may rise to

the level of an official government policy for the purposes of § 1983." *Connick v. Thompson*,

131 S.Ct. 1350, 1358 (2011). Yet, "[a] municipality's culpability for a deprivation of rights is at

its most tenuous where a claim turns on a failure to train." *Id*. (citation omitted). As a result, the

standard for such a finding is high, and "[o]nly where a municipality's failure to train its

employees in a relevant respect evidences a 'deliberate indifference' to the rights of its

inhabitants can such a shortcoming to be properly thought of as a city 'policy or custom' that is

actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).

For a municipality to be liable under § 1983 for a failure to train, a plaintiff must prove

three elements: (1) "that a training program is inadequate to the tasks that the officers must

perform; (2) that the inadequacy is a result of the [municipality's] deliberate indifference; and (3)

that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Plinton v.

Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citation and internal quotation marks

removed).

In the present case, Defendant Wilson offered testimony that he was certified in the use

of tasers in 2005, attended Taser Instructor School in 2008 and worked as a Taser instructor for

two years. (Wilson Dep., at 8, 10-11.) Additionally, both Defendant Wilson and Wheeler

attended mandatory 12-hour "use of force" training sessions annually. (*Id*.; Wheeler Dep., at 5-

6.) These use of force training sessions included instruction regarding the use of tasers. (*Id*.)

Plaintiff offers no facts or analysis and only conclusory statements regarding the sufficiency of

---

because Plaintiff has offered no evidence, analysis or case law to support such a claim. *See* FED.
R. CIV. P. 56(e).

the Defendant officers' training and Defendant Browntown's training program regarding the Taser.  *See Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 566-67 (6th Cir. 2011) (finding that plaintiffs had not produced sufficient evidence of inadequate training of officer when they failed to challenge records indicating the officer's training and significant experience and the officer had actually received the use of deadly force policy).

Plaintiff also failed to establish any pattern or practice of taser abuse by Defendant Brownstown Township officers.  Yet, the mere fact a particular officer is "unsatisfactorily trained will not alone suffice to fasten liability on the city."  *Harris*, 489 U.S. at 390-91 (citation omitted).  Rather, to establish deliberate indifference, a "Plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."  *Plinton*, 540 F.3d at 464 (citation omitted).  Alternatively, "in a narrow range of circumstances" the "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Connick*, 131 S.Ct. at 1361.

In this case, Plaintiff failed to evidence Defendant Brownstown Township was on notice of any training deficiency regarding the use of tasers, and failed to rebut or challenge the evidence that there was a sufficient training program in place.  Accordingly, Plaintiff has not evidenced the deliberate indifference of Defendant Brownstown Township and Defendant's motion for summary judgment on this claim is granted.

2.      Failure to Supervise

To the extent that Plaintiff also sets forth a separate claim of failure to supervise (which

25

is unclear given the lack of any briefing regarding this separate claim), such a claim also fails for the same reasons that his failure to train claim fails. The Sixth Circuit described a failure to supervise claim thus:

> 'failure to supervise' theory of municipal liability is a rare one. Most agree that it exists and some allege they have seen it, but few actual specimens have been proved. It appears to relate two more common theories of municipal liability: an inadequate-training theory or an acquiescence theory .... However characterized, [a claim for failure to supervise] must meet the rigorous standards of culpability and causation that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its facially lawful policies.

*Amerson v. Waterford Twp.*, 562 F. App'x 484, 491-92 (6th Cir. 2014) (quoting *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010)). Similar to a failure to train theory, a failure to supervise theory requires that the "city acted with 'deliberate indifference' to the risk of [the constitutional violation] and that its deliberate indifference was the 'moving force' behind the assault. *Id.* (citation omitted). In the present case, Plaintiff failed to evidence deliberate indifference because he has not set forth any evidence of a history of abuse or any events that would have put the Defendant Brownstown Township on notice that officer supervision was lacking or inadequate. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (analyzing a failure to train claim and a failure to supervise claim together, and concluding both claims failed based on a lack of evidence to support "any history of abuse or any events that would have put Redford Township on notice that officer training regarding the use of force or search warrant execution was deficient or likely to cause injury." (citation omitted and internal marks removed)).

D.     State Law Claims of Assault and Battery

"Under Michigan law an assault is 'an attempt to commit a battery or an unlawful act

26

which places another in reasonable apprehension of receiving an immediate battery.'" *Grawey v. Drury*, 567 F.3d 202, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 470 Mich. 622, 628 (2004)).  A battery is "an intentional, unconsented and harmful or offensive touching of the person or another, or of something closely connected with the person." *Id.* (citation omitted).

In *Odom v. Wayne County*, 482 Mich. 459 (2008), the Michigan Supreme Court explained the proper method for determining whether governmental immunity is applicable to intentional torts under Michigan law, such as assault and battery and false imprisonment, is to use the test set forth in *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984).  *See Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011).  The test in *Ross* provides that "an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature." *Id.* (citing *Odom*, 482 Mich. at 480).  Unlike qualified immunity, it is the employee who is seeking governmental immunity who bears the burden in establishing that he or she is immune from the plaintiff's claims. *Id.* (citation omitted).

As to the assault and battery claims against Defendants Wilson and Wheeler, Plaintiff does not appear to dispute that Defendants' actions satisfy the first and third *Ross* factors. Therefore, the only issue is whether Defendants Wheeler and Wilson were acting in "good faith or without malice" when Defendant Wheeler twice tased Plaintiff and Defendant Wilson jumped on Plaintiff's back with his knees while Plaintiff was handcuffed.  "Unlike qualified immunity under federal law, which uses an objective standard, '[t]he good-faith element of the *Ross* test is

27

subjective in nature.  It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.'" *Bletz*, 641 F.3d at 757 (citation omitted).  Defendants argue that the use of force utilized against Plaintiff was reasonable and Defendants are entitled to governmental immunity because they did not act with malice because Plaintiff was combative and constituted an imminent threat to Defendant Wilson prior to being tased the first time and Plaintiff actively resisted while handcuffed prior to the second (and third) tasing.

The Court finds that Defendants' argument for summary judgment on these claims repeatedly and impermissibly credits Defendants' version of the facts over the Plaintiff's version.  Taking the facts in a light most favorable to Plaintiff as examined *supra* in relation to Plaintiff's excessive force claim, a reasonable juror could conclude that the Defendant officers actions constituted an assault and battery.  Further, Defendants' request for governmental immunity must be denied where a reasonable juror could find that Defendant Wheeler's two separate deployments of the taser were not taken "in good faith or without malice."  Similarly, the Court finds a reasonable juror could believe that Defendant Wilson's actions, including jumping with his knees onto Plaintiff's back while he lay handcuffed and compliant, were not taken "in good faith or without malice."  Accordingly, Defendants' request for summary judgment and governmental immunity on the state law claims must be denied.

## IV. CONCLUSION

For all these reasons and those stated on the record, the Court GRANTS IN PART AND DENIES IN PART  Defendants' Motion for Summary Judgment (ECF No. 22).  The claims against Defendant Brownstown Township are dismissed.  The federal claim against Defendant

28

Wilson is also dismissed.  The federal claim against Defendant Wheeler proceeds.  The state

clams against both Defendants Wheeler and Wilson will also proceed.

     IT IS SO ORDERED.

          s/Paul D. Borman
          PAUL D. BORMAN
          UNITED STATES DISTRICT JUDGE

Dated:  August 31, 2016

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 31, 2016.

          s/Deborah Tofil
          Case Manager